OCCIDENTAL CHEMICAL
CORPORATION

v.

LOUISIANA PUBLIC SERVICE
COMMISSION, et al.

Carville Energy, L.L.C.

v.

Louisiana Public Service
Commission, et al.

Civil Action Nos. 06–894–
JJB, 06–903–JJB.

United States District Court,
M.D. Louisiana.

June 12, 2007.

Luke F. Piontek, Corinne M. Blache, Gayle Thomasson Kellner, Jon Kenton Parsons, Roedel, Parsons, Koch, Blache, Balhoff & McCollister, Baton Rouge, LA, Daniel A. Hagan, Earle H. O'Donnell, Zori G. Ferkin, White & Case, LLP, Washington, DC, Mike Stenglein, Ryan H. Downton, Dewey Ballantine LLP, Austin, TX, for Occidental Chemical Corporation.

Paul Zimmering, Dana M. Shelton, Noel Joseph Darce, Walter F. Wolf, III, Stone, Pigman, Walther, Wittmann, LLC, New Orleans, LA, Daria Burgess Diaz, Stone, Pigman, Walther, Wittmann, LLC, Baton Rouge, LA, Douglas G. Green, Frank H. Griffin, IV, Jennifer Quinn–Barabanov, Steptoe & Johnson, Washington, DC, Wayne J. Anderson, Karen H. Freese, Margaret Jenkins Savoye, Timothy Scott Cragin, Entergy Services Inc., New Orleans, LA, for Louisiana Public Service Commission et al.

Arthur W. Abercrombie, Jr., Edward Daniel Hughes, James Leeper Ellis, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, Ashley C. Parrish, Evan C.

Zoldan, James W. Draughn, Jr., Neil L. Levy, Kirkland & Ellis, Washington, DC, John N. Bellinger, Calpine Corporation, Houston, TX, for Carville Energy, LLC.

## RULING ON MOTIONS TO DISMISS

BRADY, District Judge.

In these consolidated actions, the defendants Louisiana Public Service Commission and commissioners Jack Blossman, Jr., James Field, Lambert Boissiere, III, C. Dale Sittig, and Foster Cambell (collectively "LPSC") have together filed motions to dismiss in both cases on the basis of Fed. Rule Civ. P. 12(b)(1) and 12(b)(6) (docs. 9 (action 06–894), 13 (action 06–903)). Co-defendant Entergy Louisiana, L.L.C. has filed a motion to dismiss in action 06–894 (doc. 12), and co-defendant Entergy Gulf States, Inc. has filed a motion to dismiss in action 06–903 (doc. 18).

Occidental opposes the motions to dismiss in action 06–894 (doc. 26). The LPSC and Entergy Louisiana have filed separate reply briefs (docs. 34, 35). Carville opposes the motions to dismiss in action 06–903 (doc. 37), and the LPSC and Entergy Gulf have filed separate reply briefs (docs. 42, 43). Jurisdiction in 06–894 is purportedly based on federal question and diversity, pursuant to 28 U.S.C. §§ 1331, 1332. Jurisdiction in action 06–903 is purportedly based on federal question and supplemental jurisdiction, pursuant to 28 U.S.C. §§ 1331, 1367. Oral argument is unnecessary.[1]

### Standard of Review

 The motions to dismiss presently before the court have been filed pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Rule 12(b)(1) motions come in two forms:

1. For purposes of this ruling, Entergy Gulf and Entergy Louisiana will be referred to as "Entergy."

(1) facial attacks and (2) factual attacks. *See U.S. v. Ortega*, 644 F.2d 512, 513 (5th Cir.1981). A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence, and it challenges jurisdiction based solely on the pleadings. *Id.* When ruling on a facial attack, the court must presume that the factual allegations in the complaint are true and determine whether they establish subject matter jurisdiction. *Id.* On the other hand, a Rule 12(b)(1) motion makes a factual attack at jurisdiction when the movant provides supporting evidence that contradicts the jurisdictional allegations in the complaint. *Id.*

In the case at bar, the defendants' 12(b)(1) motions are "facial" attacks because the motions attack jurisdiction on the basis of the pleadings alone, and not by resorting to supporting evidence. While it is true that Entergy has filed certain exhibits along with its motions to dismiss, it is clear that the basis for its 12(b)(1) motions is that Occidental and Carville cannot state a federal cause of action. This is the same basis for their motions to dismiss for failure to state a cause of action, pursuant to Rule 12(b)(6). The jurisdictional issues are intertwined with the merits, and thus the court will limit its "jurisdictional inquiry to facial scrutiny and reserve factual scrutiny for the merits." *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir.1989).[2] Because the defendants' facial attack on subject matter jurisdiction is that no federal cause of action exists, on the basis of the pleadings, it is proper to analyze this case under the familiar Rule 12(b)(6) standard of review.

Rule 12(b)(6) authorizes a dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). While the movant no longer needs to show that dismissal is warranted "beyond a doubt," a court must refrain from dismissing on the pleadings because it thinks the claims are weak or that recovery is unlikely. *See Bell Atlantic Corp. v. Twombly*, — U.S. ——, 127 S.Ct. 1955, 1965, 1969, 167 L.Ed.2d 929 (2007) (abrogating the holding in *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) that the movant must prove, beyond doubt, that no relief is warranted on the basis of the factual allegations in the pleadings). It is still the law in this circuit that a motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982). The court accepts all well-pleaded facts as true, and it views them in a light most favorable to the nonmovant. *Capital Parks, Inc. v. Southeastern Adver. and Sales Sys., Inc.*, 30 F.3d 627, 629 (5th Cir.1994); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir.1994).

At the same time, however, conclusory allegations and unwarranted factual deductions masquerading as well-pleaded facts will be ignored. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994): *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th

---

**2.** The court notes that even if the jurisdictional inquiry was not intertwined with the merits, it is too early in the litigation to consider contested facts. Before resolving disputed issues of fact raised in a Rule 12(b)(1) motion, a court "must give the plaintiff an opportunity for discovery and a hearing." *See In re Arbitration Between Trans Chem. Ltd. And China Nat'l Machinery Import & Export Corp.*, 978 F.Supp. 266, 274–75 (S.D.Tex.1997); *see also Martin v. Morgan Drive Away*, 665 F.2d 598, 602 n. 1 (5th Cir.1982) (noting that dismissal under Rule 12(b)(1) is improper unless the court permits discovery and holds an evidentiary hearing). Discovery in this case has only recently begun, as evidenced by the June 4, 2007 order denying the defendants' motion to stay discovery.

Cir.1974). In the end, the defendants have a very high burden in proving dismissal on the basis of barebone pleadings. The Fifth Circuit has stated that "[d]ismissal on the basis of barebone pleadings is a precarious disposition with a high mortality rate." *Int'l Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv.*, 400 F.2d 465, 471 (5th Cir.1968).

### Statement of Facts

With the applicable standard of review in mind, the court addresses the wellpleaded facts as found in the complaints of Carville and Occidental.

Under the Federal Power Act, 16 U.S.C. § 791, *et seq.*, Congress granted the Federal Energy Regulatory Commission ("FERC") with exclusive jurisdiction and authority to regulate the sale of electric power at wholesale in interstate commerce. In 1978, Congress amended the Federal Power Act by enacting the Public Utility Regulatory Policies Act ("PURPA"). *See* 16 U.S.C. § 824a–3, *et seq.* PURPA was enacted in response to a then-present nationwide energy crisis. *See FERC v. Mississippi*, 456 U.S. 742, 745, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). § 210 of PURPA was enacted to encourage the development of cogeneration facilities and small power production facilities, and to reduce the demand for fossil fuels. The cogeneration facilities are known in the industry as "qualifying facilities" ("QF's").

Prior to enactment of PURPA, traditional electric utilities hesitated from purchasing electric power from QF's. In order to overcome this obstacle, Congress enacted § 210(a) of PURPA, which directed the FERC to promulgate rules to encourage cogeneration and small power production, including rules requiring electric utilities to purchase electricity from, and sell electricity to, QF's. *FERC v. Mississippi*, 456 U.S. at 750–51, 102 S.Ct. 2126. Pursuant to § 210(b) of PURPA, utilities must pur-

chase electricity from QF's at the utility's "avoided cost." The FERC has defined "avoided cost" as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6).

To ensure that utilities are properly implementing the requirements of PURPA (by paying QF's the full avoided cost), Congress requires each state agency with regulatory authority over electric public utilities (in this case the LPSC) to fully and properly implement PURPA's provisions. 16 U.S.C. § 824a–3(f). Federal circuits have recognized that a state commission's failure to ensure that utilities pay QF's for energy at a rate equal to the utilities' full avoided cost "is a failure to comply with a regulation implementing" PURPA. *See Conn. Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1043 (D.C.Cir.2000): *New York State Elec. Gas Corp. v. FERC*, 117 F.3d 1473, 1476 (D.C.Cir.1997); *Indep. Energy Producers Ass'n v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 858–59 (9th Cir. 1994).

The LPSC initially implemented PURPA and FERC regulations in 1982. On February 27, 1998, the LPSC issued a "General Order" amending and superceding its 1982 order. The General Order, *inter alia,* required utilities subject to the jurisdiction of the LPSC to purchase all energy and capacity made available by QF's at prices equal to the purchasing utilities' "avoided cost." The 1998 General Order defined "avoided cost" in the exact same way as the FERC's definition. The General Order required a purchasing utility to determine its avoided cost on an hourly basis using an economic dispatch model that calculated the difference between the cost of energy actually furnished

by the utility and the cost the utility would have been required to incur absent the presence of the QF's supply.

On August 31, 2002, Carville and Entergy Gulf entered into a power purchase agreement confirming the terms under which Entergy Gulf (being the regulated utility) would purchase power from Carville (being the QF). Occidental (being another QF) entered into a similar power purchase agreement with Entergy Louisiana (being another regulated utility). The agreements were expressly designed to implement the statutory and regulatory requirements related to QF's that were then presently in force under federal and state law. The agreements stated that the rate at which Entergy would purchase power would be "the calculated hourly Avoided Energy Cost at the time of delivery to Entergy." The agreements defined avoided energy cost in the same manner as the definition found in the 1998 General Order, which in turn was identical to the FERC's definition. The agreements included notice provisions requiring either party to provide written notice before seeking to take advantage of changes in statutory or regulatory requirements. For example, with respect to the Carville contract, the contract made clear that before taking advantage of statutory or regulatory changes, Entergy Gulf would provide Carville's asset manager in Houston with ninety days written notice.

Approximately one year after entering into the agreements with Carville and Occidental, Entergy sent a letter to the LPSC proposing to modify the 1998 General Order's methodology for calculating the avoided cost Entergy had to pay to QF's. Entergy's goal was, of course, to substantially lower the payments it had to make to QF's and still be in compliance with PURPA. The LPSC issued an interim order on October 16, 2003, permitting

Entergy to modify its avoided cost methodology pending a full investigation. In considering Entergy's proposed changes, the LPSC acknowledged the "magnitude of the potential impact of the modifications to the avoided cost calculation methodology," and it made clear that the new requirements, if approved, would be applied only prospectively.

On October 31, 2005, the LPSC, Entergy, and several QF's filed a stipulated settlement regarding Entergy's proposed methodology. As alleged in the complaints, the settlement actually resulted in QF's being paid less than Entergy's full avoided costs. Accordingly, Carville and Occidental, but none of the other QF's, filed objections to the proposed settlement. On June 27, 2006, a LPSC administrative law judge issued a recommendation stating that the settlement (which allowed Entergy to modify its avoided cost methodology) was in compliance with PURPA and the 1998 General Order. The ALJ's recommendation was adopted in full by the LPSC on August 15, 2006. Neither Carville nor Occidental chose to pursue an appeal of the LPSC's order in the Louisiana state courts.

Following the LPSC's decision, both Carville and Occidental filed petitions for enforcement, pursuant to § 210(h) of PURPA, before the FERC. Carville and Occidental sought the FERC to order the LPSC to properly implement PURPA rules and FERC regulations. Their argument was that by authorizing Entergy to revise its avoided cost methodology, Entergy would actually pay less than its full avoided cost, and the LPSC was required under PURPA to ensure that regulated utilities purchased power from QF's at the utilities' full avoided cost. The FERC, however, elected to take no action. Under 16 U.S.C. § 824a–3(h)(2)(B), "[i]f the [FERC] does not initiate an enforcement

action ... against a State regulatory authority ... within 60 days following the date on which a petition is filed ... the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority ... to comply with such requirements...." After the passage of 60 days, Carville and Occidental filed their respective complaints in this court.

With respect to Count I of both Carville's and Occidental's complaints, the plaintiffs seek to enforce the FERC's federal regulations under § 210(h) of PURPA. Both plaintiffs contend that the LPSC's order authorizing Entergy to modify its avoided cost methodology violates PURPA because the LPSC, pursuant to PURPA, must ensure that utilities, such as Entergy, pay QF's, such as the plaintiffs, the full avoided cost. Both complaints allege in Count II that the LPSC's final order is preempted by the Federal Power Act, PURPA, and the FERC's regulations. The preemption claims are based on the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2.

In Count III of Carville's complaint and Count V of Occidental's complaint, the plaintiffs claim that each respective Entergy subsidiary breached a covenant of good faith and fair dealing with the plaintiffs. The plaintiffs claim that Entergy engaged in a subterfuge by developing an improper methodology that it knew would systematically understate its avoided costs on which contractual payments to the plaintiffs were based. Count IV of Carville's complaint and Count IV of Occidental's complaint both allege breach of contract by the respective Entergy subsidiaries vis a vis the respective power purchase agreements entered into with the plaintiffs. Finally, Count III of Occidental's complaint demands an accounting from Entergy Louisiana because Entergy allegedly did not fully pay Occidental as required by its respective power purchase agreement.

## Discussion

### A. Motions to Dismiss Complaints Against LPSC

#### 1. Count I of the Complaints

The motions to dismiss filed by the LPSC focus on Counts I and II of both Occidental's and Carville's complaints, as those are the only counts alleging claims against the LPSC. The crux of the LPSC's argument is that Occidental and Carville have brought claims attacking the LPSC's application of PURPA and FERC regulations, and in essence, the "as-applied" challenge is one made pursuant to § 210(g) of PURPA. The LPSC argues that § 210(g) "as-applied" challenges may only be brought in state court. Thus the LPSC argues that this court has no subject matter jurisdiction, and the plaintiffs fail to state a claim, because no federal cause of action for an "as-applied" challenge exists under PURPA.

The plaintiffs counter by arguing that their claims against the LPSC are not "as-applied" challenges, but rather are claims that the LPSC failed to *implement* PURPA and the FERC regulations. The plaintiffs maintain that their claims do not fall under § 210(g) of PURPA, but rather fall under § 210(h)—a provision providing for a private right of action in federal court.

■ The court has carefully studied the parties' lengthy briefs and the applicable cases. For the reasons stated herein, the court agrees with the plaintiffs, in that their complaints sufficiently allege that the LPSC failed to implement PURPA and the FERC regulations. Accordingly, the plaintiffs' claims against the LPSC are claims under § 210(h) of PURPA—namely claims that seek to require the LPSC (a state regulatory authority under the Fed-

eral Power Act) to comply with PURPA's requirements and the FERC's regulations.

Carville avers that by approving the new methodology for calculating avoided costs, the LPSC has failed to faithfully implement the rules prescribed by the FERC, as required by federal law.[3] The complaint alleges that the LPSC's methodology "systematically understates utilities' avoided costs and ensures that ... qualifying facilities in Louisiana will never receive" the full avoided cost rate that federal law mandates.[4] Carville claims that the LPSC's new methodology contravenes federal regulations and violates PURPA because it allows utilities in Louisiana to purchase energy from QF's at a rate significantly lower than their full avoided costs.[5] The new methodology, according to Carville, "conflicts with and undermines both the specific requirements of federal law and the broader nationwide energy policy developed by Congress and regulated by the [FERC]."[6]

Occidental makes similar allegations in its first two counts. For example, Occidental alleges that the LPSC's order approving the new avoided cost methodology violates PURPA.[7] Occidental alleges that the LPSC's order "effectively rewrites the rules regarding calculation of 'avoided costs' by failing to implement the definition of 'avoided costs' as contained in PURPA."[8] Occidental claims that the failure to implement the avoided cost of PURPA applies not only to itself, but to a broad scope of QF's supplying Entergy with energy.[9] Occidental avers that "the avoided cost methodology approved in the

LPSC Order fails to properly implement PURPA because it results in QF's receiving less than avoided cost...."[10]

These allegations more than suffice to invoke this court's jurisdiction under § 210(h) of PURPA. Federal jurisdiction under § 210(h) exists whenever a state regulatory authority has adopted requirements that "include a purchase rate standard contrary to existing [FERC] regulations." *Policy Statement Regarding the FERC's Enforcement Role Under § 210*, 23 FERC ¶ 61,304 at 61,644 (1983). Federal circuits recognize that a state regulatory body's failure to ensure that utilities pay QF's for energy at a rate equal to the utilities' full avoided cost "is a failure to comply with a regulation implementing" PURPA, and that a challenge against the state commission may be brought in federal court. *See e.g., New York State Elec. Gas Corp.*, 117 F.3d at 1476.

At the very least, this court is not persuaded that the defendants have proved that the plaintiffs are not entitled to relief. The defendants principally rely on three cases in support of their position that no federal cause of action against the LPSC has been stated. *See Windway Techs., Inc. v. Midland Power Co-op.*, 2001 WL 1248741, No. C00–3089MWB (N.D.Iowa, March 5, 2001); *Greensboro Lumber Co. v. Ga. Power Co.*, 643 F.Supp. 1345 (N.D.Ga. 1986); *Mass. Inst. of Tech. v. Ma. Dep't of Pub. Utils.*, 941 F.Supp. 233 (D.Mass. 1996).

First, in *Windway Techs.*, a federal court in Iowa held that the plaintiffs had not properly invoked federal jurisdiction

---

3. Carville's Complaint, ¶¶ 3, 62–78, 82.

4. *Id.* at ¶ 3.

5. *Id.* at ¶ 3, 82.

6. *Id.* at ¶ 4.

7. Occidental's Complaint, ¶ 25.

8. *Id.*

9. *Id.* at ¶ 28.

10. *Id.* at ¶ 53.

when they alleged that a state's "tariffs, as they appli[ed] to [plaintiffs] violate[d] PURPA." *Windway Techs.*, 2001 WL 1248741, at *6. The district court emphasized that the plaintiffs admitted their claims were "as-applied" claims, and that the plaintiffs explicitly stated that they were not seeking to enforce that the state commission properly implement PURPA. *Id.* at *6–7. Although the plaintiffs admitted in federal court that their claims were "as applied" challenges (in which jurisdiction was vested solely in the state court), the Iowa Supreme Court ultimately found that their claims fell "in the category of an implementation, not an application, issue." *Windway Techs., Inc. v. Midland Power Co-op.*, 696 N.W.2d 303, 308 (Iowa 2005).

In the case at bar, Carville's and Occidental's complaints allege that the LPSC failed to *implement* PURPA rules and FERC regulations. Neither plaintiff has ever admitted that their challenges against the LPSC are only challenges "as-applied" to them.

*In Greensboro Lumber Co.*, the plaintiff alleged that it was "unable to obtain back-up or maintenance power at a nondiscriminatory, just and reasonable rate" from a non-regulated utility, as required by § 210(c) of PURPA. *Greensboro Lumber Co.*, 643 F.Supp. at 1358, 1374. The district court held that jurisdiction did not exist because the plaintiff was making an "as-applied" challenge instead of an *implementation* challenge. *Id.* at 1374. The court found the claims to be as-applied because the non-regulated utility "failed to adhere to its own implementation plan in its dealings with a particular" QF. /of.

Inasmuch as the *Greensboro Lumber Co.* court relied upon the allegation that the non-regulated utility violated PURPA as-applied to the plaintiff alone, the case is

distinguishable. In the case *sub judice*, neither Carville nor Occidental allege that the LPSC order violates PURPA *as-applied* to either plaintiff alone. Instead, the averments in the complaints consist of accusations that the LPSC order violates PURPA by unlawfully implementing the avoided cost rule across all QF's.

Finally, the defendants rely upon *Mass. Inst. of Tech.*, In that case, the district court held that it lacked jurisdiction because the plaintiffs' complaint only alleged "as-applied" claims. The court noted that the plaintiff was "the only customer" in a class of customers subject to the challenged state requirements. *Mass. Inst. of Tech.*, 941 F.Supp. at 238.

Like *Greensboro Lumber Co.*, *Mass. Inst. of Tech.* is distinguishable because neither Carville nor Occidental allege that either is the only QF subjected to the new methodology for calculating avoided cost. To the contrary, Occidental alleges that "the LPSC's failure to implement PURPA is demonstrated by the broad scope of entities to whom the LPSC's Order applies . . . ." [11]

■ This court is persuaded by the Fifth Circuit's decision in *Power Res. Group v. Pub. Util. Comm'n of Tex.*, 422 F.3d 231 (5th Cir.2005). In that case, the Fifth Circuit detailed the district court's thought-process in concluding jurisdiction existed. The Fifth Circuit noted,

> The district court then elucidated the distinction between two types of enforcement claims under PURPA, "as applied" claims and implementation claims: " 'An implementation claim involves a contention that the state agency . . . has failed to implement a lawful implementation plan under § 824a–3(f) of the PURPA, whereas an "as-applied" claim involves a contention that the state agency's . . .

---

11. Occidental's Complaint, ¶ 28.

implementation plan is unlawful, as it applies to or affects an individual petitioner.'" The district court explained that federal district courts only have jurisdiction if the party has first petitioned FERC to bring an enforcement action and FERC failed to do so, and the claim must challenge the state regulations as unlawful implementations of PURPA and FERC regulations. Federal courts may not hear "as applied" claims, because jurisdiction over such claims is reserved to the state courts. *Power Res. Group*, 422 F.3d at 235 (citations omitted). The Fifth Circuit never questioned the district court's holding that the plaintiff had properly invoked federal court jurisdiction under § 210(h) of PURPA. The court recognizes that the district court's analysis of jurisdiction is only *dicta* as far as the Fifth Circuit's opinion is concerned, but the Fifth Circuit's decision is nonetheless significant because "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Thus, this court finds the Fifth Circuit's failure to analyze the district court's jurisdictional decision as persuasive authority that the Fifth Circuit agreed with the district court's analysis.

Applying that district court's analysis to the case at bar, nothing in the complaints suggest that the LPSC order affects only an "individual petitioner" (in this case either Carville or Occidental). The complaints allege that the LPSC's failure to implement PURPA affects a "broad scope of entities." Thus, the claims do not fall under the "as-applied" umbrella, but rather fall into the "implementation" category. The plaintiffs' claims involve contentions that the LPSC failed to implement a lawful implementation plan under § 210(f) of PURPA.

The defendants' attempt to cast the allegations in the complaint as "as-applied" challenges is not persuasive. The standard of review requires the court to view the allegations in the complaints in a light most favorable to Carville and Occidental. The well-pleaded facts are accepted as true. It may be that ultimately the evidence will show that the claims are indeed "as-applied" challenges, or that the LPSC has done nothing wrong. However, at this time, without the aid of any evidence, the court cannot say that the allegations do not allege a cause of action under § 210(h) of PURPA.

### 2. Counts II of the Complaints

In Counts II of the respective complaints, Occidental and Carville seek declaratory and injunctive relief under the Supremacy Clause of the Federal Constitution. U.S. Const. Art. VI. The LPSC and Entergy maintain that the Johnson Act, 28 U.S.C. § 1342, compels dismissal of the plaintiffs' preemption claims. The Johnson Act states, in pertinent part,

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342.

The LPSC's argument that the plaintiffs' second counts should be dismissed hinges on this court dismissing the first counts (which this court refuses to do at this time). *See LPSC's Memo in Support of Motion to Dismiss*, at pp. 19–20. The LPSC argues that all four elements of the Johnson Act are satisfied. The LPSC posits that once the court dismisses the PURPA claims, all that remains is the supremacy clause claims—in which jurisdiction is based solely on repugnance of the order to the Federal Constitution. Without considering whether the Johnson Act is even applicable, the court's ruling on Count I precludes a finding that the first element under the Johnson Act is satisfied.

As mentioned above, the PURPA claims survive a 12(b)(6) attack. The PURPA claims and the Supremacy claims are based on alleged violations of *federal statutes*. The claims are not solely constitutional in nature. As the Eighth Circuit has explained in a similar case in which it rejected the Johnson Act argument,

> Jurisdiction is not based "solely" either on diversity or on "repugnance" of the [rate] order to the Federal Constitution. It is based, in part at least, on the theory, not at all insubstantial, that [the rate order] was in conflict with and preempted by the Federal Power Act. It is true, of course, that a federal statute overrides conflicting state law only because of the Supremacy Clause of the Federal Constitution. In a sense, therefore, a preemption claim always asserts repugnance of state law to the Federal Constitution. But such a claim does not usually require that the Constitution itself be interpreted. Rather, the meaning of federal statutes and of state law must be explored, and the extent of any conflict ascertained. A state law struck down on the basis of preemption is perhaps more aptly labeled "unstatutory" than "unconstitutional." In any case, whatever the theoretical arguments might be, all of the appellate authority in point of which we are aware upholds federal jurisdiction in utility rate cases where a substantial claim of federal statutory preemption is pleaded.

*Ark. Power & Light Co. v. Mo. Pub. Serv. Comm'n*, 829 F.2d 1444, 1449 (8th Cir. 1987).

Moreover, the First Circuit has similarly stated that the Johnson Act "does not apply to claims based upon congressional statute or federal administrative rulings, even though these commands are ultimately backed up by the Supremacy Clause (and are therefore arguably 'constitutional' claims). The case law on this point is so clear cut that no further discussion of the point is required." *Pub. Serv. Co. v. Patch*, 167 F.3d 15, 25 (1st Cir.1998). The Fourth and Ninth Circuits have made similar statements in *Aluminum Co. of Am. v. Utils. Comm'n*, 713 F.2d 1024, 1028 (4th Cir.1983) and *Int'l Bd. of Elec. Workers v. Pub. Serv. Comm'n*, 614 F.2d 206, 209–11 (9th Cir.1980). The Third Circuit has joined the fold of courts holding that preemption claims based on PURPA do "not rely solely on constitutional grounds," and thus the Johnson Act is inapplicable. *Freehold Cogeneration Assocs. v. Bd. of Regulatory Comm'rs of N.J.*, 44 F.3d 1178, 1186–87 (3d Cir.1995). Finally, similar authority in the Fifth Circuit exists under *New Orleans Pub. Serv., Inc. v. New Orleans*, 782 F.2d 1236, 1242 (5th Cir.1986), *modified in part*, 798 F.2d 858, *cert. denied*, 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987).

The burden of proving that all four elements of the Johnson Act have been satisfied lies with the party seeking

to invoke the Act. *Williams v. Prof'l Transp., Inc.,* 388 F.3d 127, 131 (4th Cir. 2004); *Ark. Power & Light Co.,* 829 F.2d at 1449. At this time, the court is not persuaded that the defendants have satisfied their burden. In the case at bar, the plaintiffs' Supremacy Clause claims are based on federal statutes. Specifically, the plaintiffs claim that the 2006 LPSC Settlement Order violated the Federal Power Act requirement that rates for wholesale sales of power in interstate commerce be "just and reasonable" and "not unduly discriminatory." 16 U.S.C. §§ 813, 824d(a), 824(d), 824e(a). As amended by PURPA, rates for wholesale energy sales by QF's are to be determined by FERC regulations. PURPA requires the LPSC to ensure that FERC regulations are enforced against the regulated utilities, such as Entergy. The plaintiffs claim that the LPSC has failed to enforce PURPA and FERC regulations. In doing so, the plaintiffs allege the LPSC order modifying the avoided cost methodology violates the Federal Power Act, and thus violates the Supremacy Clause. Therefore, both Carville's and Occidental's counts II sufficiently state preemption claims under the Supremacy Clause.

Nonetheless, Entergy argues that because the plaintiffs' preemption claims are nothing more than a repackaging of their PURPA claims, the preemption claims cannot stand on their own. Entergy relies on *Niagara Mohawk Power Corp. v. Fed. Energy Regulatory Comm'n,* 306 F.3d 1264 (2d Cir.2002). The court agrees with Entergy that in *Niagara Mohawk,* the Second Circuit affirmed dismissal of PURPA and Supremacy Clause claims. However, the court never held that a preemption claim cannot stand on its own when a PURPA claim is pleaded in the alternative. Instead, the plaintiffs PURPA claim in that case was dismissed because it failed to exhaust administrative

remedies prior to filing suit in federal court. *Niagara Mohawk,* 306 F.3d at 1269–70. The Second Circuit stated that the district court should not have treated the plaintiff's PURPA claim and preemption claim as independent for purposes of complying with the exhaustion of administrative remedies requirement because the claims were identical. *Id.* at 1270. However, the court never indicated that when pursuit of all administrative remedies has been exhausted, a PURPA claim and a preemption claim, even though identical, cannot stand independently. This is the scenario in the case at bar. Accordingly, the court is not persuaded to follow *Niagara Mohawk.*

The court stresses to the defendants that this case is here only on a motion to dismiss. It is very early in the litigation process. It is routine to file alternative claims at this stage in the proceedings. The Federal Rules of Civil Procedure envision pleading in the alternative. For example, Rule 8(a)(2) states that a "party may set forth two or more statements of a claim … alternatively or hypothetically, either in one count … or in separate counts." Fed. Rule Civ. P. 8(a)(2). The Fifth Circuit has stated that even if alternative theories of recovery are "supported by the same factual allegations" they are not subject to dismissal. *Robertson v. Bd. of Supervisors of La. State Univ. Agric. & Mech. College,* No. 01–30381, 2001 WL 1131950, *2 (5th Cir. Sept. 20, 2001); *see 5 Wright & Miller,* Fed. Prac. & Proc. Civ.3d, § 1257 (2006) ("Under Federal Rules 8(a)(3) and 8(e)(2), a party may demand relief in the alternative or of several different types. No election between or among remedies is necessary at the pleading stage.") (footnote omitted).

 Finally, the defendants argue that should the court not dismiss the first two counts of each respective plaintiffs'

complaint, the court should abstain under the Burford doctrine. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *Burford* abstention is improper in this case. *Burford* abstention kicks in when difficult questions of state law are at issue, or when federal adjudication would be disruptive of state efforts to settle state law. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989).

Neither Carville's nor Occidental's PURPA or preemption claims involve state law. § 210(f) of PURPA permits the plaintiffs to seek enforcement of PURPA and FERC regulations against the LPSC in federal district court. By statute, Congress has mandated that PURPA claims under § 210(h) (implementation claims as opposed to § 210(g) as-applied claims) are to be brought in *federal* court. *See* 16 U.S.C. § 824a–3(h)(2)(B); *see also Indus. Cogenerators v. FERC*, 47 F.3d 1231, 1236 (D.C.Cir.1995) (finding that "Congress created in § 210 ... of ... PURPA ... a scheme [that] involves the promulgation of regulations by the FERC, and their subsequent enforcement exclusively in federal district court, at the insistence of either a private party or of the FERC itself").

Clearly then, given the court's ruling that jurisdiction exists over both the PURPA and preemption claims. *Burford* abstention is unwarranted. The court holds that the defendants have failed to prove beyond a doubt that either Carville or Occidental have failed to state a cause of action alleging that the LPSC order violated the Supremacy Clause of the Federal Constitution.

## B. Motions to Dismiss Complaints Against Entergy

### 1. Jurisdiction

Counts III and IV of Carville's complaint, and counts V and IV of Occidental's complaint, respectively claim that Entergy breached a covenant of good faith and fair dealing, and breached contract. While Carville's allegations are against Entergy Gulf, and Occidental's allegations are against Entergy Louisiana, the court finds the allegations to be sufficiently similar (along with finding the respective power purchase agreements to be sufficiently similar) such that the court will consider the separate plaintiffs' allegations together. In this vein, the court will treat the separate defendants, Entergy Gulf and Entergy Louisiana, together as "Entergy."

The plaintiffs claim that Entergy breached an implied covenant of good faith and fair dealing by intentionally and maliciously formulating a method of calculating avoided costs that systematically understated Entergy's avoided costs. The plaintiffs' breach of contract claims are based on the allegation that Entergy was required to pay them the full avoided cost, as calculated pursuant to the LPSC methodology *ante* the 2006 Settlement Order, for all energy purchased, and that Entergy's failure to do so was in breach of the respective power purchase agreements.

The court first notes that Entergy challenges the court's subject matter jurisdiction. Federal courts have a duty to raise the question of subject matter jurisdiction *sua sponte. Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 575 (5th Cir. 2003). There is no dispute that Carville has sufficiently pleaded diversity jurisdiction pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, and the dispute is between citizens of different states. Entergy is a citizen of Texas for purposes of diversity jurisdiction, and Carville is not.

Jurisdiction over Occidental's claims against Entergy exists pursuant to

28 U.S.C. § 1367 (supplemental jurisdiction). § 1367(a) provides district courts with jurisdiction over all "claims that are so related to claims [over which the court has] original jurisdiction." The Fifth Circuit has commented that by "employing the 'case or controversy' language found in Article III," Congress intended courts to exercise supplemental jurisdiction to the full extent permitted by the Constitution. *Rodriguez v. Pacificare of Tex., Inc.,* 980 F.2d 1014, 1018 (5th Cir.1993).

This court sees no problem in asserting supplemental jurisdiction over Occidental's contract claims because those claims are pendant to the federal questions presented by Occidental's federal statutory and constitutional claims against the LPSC. In particular, both the contract claims and the federal claims involve changes, proposed by Entergy, to the LPSC's methodology for calculating avoided costs under federal law. Under the terms of Occidental's contract with Entergy, the payments to be made by Entergy to Occidental for its power are to be priced at avoided costs, as that term is defined in the LPSC's Avoided Cost General Order. Therefore trial on this lawsuit will involve Entergy's and the LPSC's witnesses and documents, including evidence on such matters as how the new avoided cost methodology was developed, data input used by Entergy in calculating the avoided cost, the structural limitations that the avoided cost model contains, and communications between Entergy and the LPSC on each of these topics. Thus in this case, the contract claims share a "common nucleus of operative facts" with the federal claims. Moreover, the state law claims arise from the same controversy as the federal law claims against the LPSC. *See City of Chicago v.*

*Int'l Coll. of Surgeons,* 522 U.S. 156, 164–65, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997).

Entergy next argues that the plaintiffs' contract claims should be dismissed because the LPSC purportedly enjoys primary jurisdiction to hear those claims. In support of its position, Entergy emphasizes that the LPSC has initial authority to approve agreements between QF's and utilities, and therefore the LPSC has primary jurisdiction over matters involving the fixing of state utility rates.

▬▬ The doctrine of primary jurisdiction, however, is only a *prudential* doctrine under which a court is permitted, but not required, to defer to a government agency when (1) the agency has concurrent jurisdiction over an issue, and (2) the court desires to defer to the agency's special expertise. *See Rogers v. Columbia/HCA of Cent. La., Inc.,* 961 F.Supp. 960, 966 (W.D.La.1997). At issue in this case are contract claims. Contract claims do not require the resolution of predicate factual issues within the LPSC's special expertise. *Northwinds Abatement, Inc. v. Employers Ins. of Wausau,* 69 F.3d 1304, 1311 (5th Cir.1996). This court, and not the LPSC, has the special expertise with which to interpret contracts, and to determine whether breaches of contract occurred. *Cent. La. Elec. Co., Inc. v. La. Pub. Serv. Comm'n,* 601 So.2d 1383, 1386 ("The [Louisiana] [l]egislature has never 'provided by law' for the [LPSC] to exercise jurisdiction over other subject matters and areas of litigation in which public utilities are involved, such as tort actions and contract disputes."). Accordingly, at this time, without the aid of any evidence, the court does not find the doctrine of primary jurisdiction to be applicable.[12]

---

12. Entergy's reliance on La.Rev.Stat. 45:1176 and § 301 of the LPSC's regulations is misplaced. La.Rev.Stat. 45:1176 does not vest

the LPSC with primary jurisdiction over *contract disputes.* It merely allows the LPSC to "disallow as an operating expense of any pub-

### 2. The Plaintiffs Have Stated a Cause of Action for Breach of the Duty of Good Faith and Fair Dealing

■ "As a general rule, Louisiana recognizes an implied covenant of good faith and fair dealing in every contract." *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 296 (5th Cir.1997); *Brill v. Catfish Shaks of Am.*, 727 F.Supp. 1035, 1039 (E.D.La.1989). The Louisiana Civil Code requires contracts to "be performed in good faith." La. Civ.Code Arts.1983, 1759.

■ The plaintiffs claim that Entergy breached its duty of good faith and fair dealing by agreeing to contract terms with Carville and then, in bad faith, procuring a change in state requirements that would seek to deprive the plaintiffs of the benefit of their bargain. The plaintiffs claim that rather than complying with its contractual obligations or negotiating to change those obligations, Entergy sought unilaterally to modify the parties' agreed-upon methodology in a way that Entergy knew would systematically understate its avoided costs. At this time, the court holds that such allegations are sufficient to state a cause of action. *See e.g., California v. Chevron Corp.*, 872 F.2d 1410, 1413–14 (9th Cir. 1989); *Sunoco, Inc. v. Honeywell Int'l Inc.*, 2006 WL 709202, No. 05CIV7984 (S.D.N.Y., Mar. 21, 2006).

### 3. The Plaintiffs Have Stated a Cause of Action for Breach of Contract

■ The respective power purchase agreements provided that the parties were entering into the agreement in order "to implement the statutory and regulatory requirements relating to Qualifying Facilities presently in force under federal and state law." The contracts required Entergy to purchase energy from the plaintiffs at a rate equal to the "calculated hourly Avoided Costs at the time of delivery" to Entergy. Under La. Civ.Code Art.1994, a party to a contract is "liable for the damages caused by his failure to perform a conventional obligation." A failure to pay money due under a contract is a failure to perform in the context of La. Civ.Code. Art.1994. *Whitney Nat'l Bank of New Orleans v. Poydras*, 557 So.2d 422, 425–26 (La.App.1990). In the case at bar, the plaintiffs have alleged that Entergy failed to pay money owed under a contract.

Moreover, the allegations are that the parties intended to "implement the statutory and regulatory requirements relating to Qualifying Facilities presently in force under federal and state law." The new avoided cost that Entergy paid, pursuant to the 2006 LPSC Settlement Order, was not "presently in force" at the time of executing the respective power purchase agreements in 2002. What the parties intended the purchase price of energy to be is a factual question that cannot be resolved at this stage of the proceedings. *See Ravy v. Bridge Terminal Transp.*, 883 So.2d 1139, 1143–44 (La.Ct.App.2004) (holding that dispositive motions are "rarely appropriate for a determination based on subjective facts such as intent"); *Johnson v. Hitchens*, 518 So.2d 1154 (La.Ct.

---

lic utility such part of the amount so paid by it under any such contract or agreement as the commission or parochial or municipal body may find, after hearing, to be unjust or unreasonable and designed for the purpose of concealing, abstracting or dissipating the net earnings of the public utility." La.Rev.Stat. 45:1176.

Moreover, § 301 of the LPSC's regulations is a *permissive* rule that provides that disputes between an electric utility and a QF *"may* be instituted by the filing of a petition with the [LPSC]." *LPSC Rule,* § 301(a) (emphasis added).

App.1987). At this time, the court finds that the plaintiffs have alleged sufficient facts to state a cause of action for breach of contract.

### 4. The Filed Rate Doctrine Does Mot Apply

Finally, the court considers Entergy's argument that the "filed rate doctrine" requires dismissal of the contract claims. Entergy posits that the new avoided cost methodology, per the 2006 LPSC Settlement Order, provides for the only rate that it may charge QF's under the filed rate doctrine.

 The filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981); *see H.J., Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 494 (8th Cir. 1992) ("[T]he rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency."). While the filed rate doctrine forbids Entergy from charging a rate that is different than the rate filed with the FERC, Entergy has not persuaded the court that the filed rate doctrine is applicable to this case. For example, if the evidence shows, as the plaintiffs allege, that the LPSC failed to implement PURPA and FERC regulations because Entergy engaged in a "subterfuge" to "intentionally and maliciously" submit an improper rate methodology to the LPSC, Entergy may be liable for damages.

Entergy heavily relies on *Ark. La. Gas Co.*, but that case does not directly control this case. In that case, the Louisiana Supreme Court awarded an amount of damages on a breach of contract claim that in effect set a rate that the FERC never deemed reasonable. *See id.* at 580–81, 101

S.Ct. 2925. The United States Supreme Court held,

> In the case before us, the Louisiana Supreme Court's award of damages [for breach of contract] to respondents was necessarily supported by an assumption that the higher rate respondents might have filed with the Commission was reasonable. Otherwise, there would have been no basis for that court's conclusion that the Commission would have approved the rate. But under the filed rate doctrine, the Commission alone is empowered to make that judgment, and until it has done so, no rate other than the one on file may be charged.

*Id.* (citation omitted). The case at bar is distinguishable. In the case at bar, the LPSC has already deemed the old rate reasonable, as that rate was approved by the LPSC. The plaintiffs claim that the new 2006 rate, pursuant to the 2006 LPSC Settlement Order, is unreasonable and in violation of PURPA. Should the evidence prove this to be true, and should the breach of contract claims be sustained, then the question is raised, "May the court apply the old rate, which was previously on file and approved by the FERC, to calculate damages?" Entergy has not persuaded the court that the answer is, beyond a doubt, "NO."

In *Ark. La. Gas Co.*, the Louisiana Supreme Court applied a rate that was never approved by the FERC. The Louisiana court merely assumed that had the new rate been filed, it would have been approved by the FERC. *Id.* at 580, 101 S.Ct. 2925. That was impermissible under the filed rate doctrine, but as just mentioned, the present case involves a rate that was previously on file and deemed reasonable by the LPSC.

 The filed rate doctrine precludes a court from determining what the regulato-

ry body *would have* deemed to be a reasonable rate. *See H.J., Inc.*, 954 F.2d at 488. In the case at bar, should the court conclude that the rate filed pursuant to the 2006 LPSC Settlement Order was illegal, the court would not have to determine what rate the LPSC would have deemed to be reasonable. The court would simply use the immediately pre-existing rate filed with the LPSC.

The court is not persuaded at this time that the filed rate doctrine bars the plaintiffs' request for damages on their contract claims. *See e.g., Tex. Commercial Energy v. TXU Energy, Inc.*, No. C-03-249, 2004 WL 1777597, at *16 (S.D.Tex., Jun. 24, 2004) (denying a motion to dismiss a breach of contract claim on the basis of the filed rate doctrine). The burden on a 12(b)(6) motion to prove that no cause of action exists is on the movant. Entergy failed to satisfy its burden.[13]

### Conclusion

It shall be the order of this court that in action 06–894, the motions to dismiss filed by the LPSC (doc. 9) and Entergy Louisiana (doc. 12) are DENIED. It shall further be the order of this court that in action 06–903, the motions to dismiss filed by the LPSC (doc. 13) and Entergy Gulf (doc. 18) are DENIED.

13. As one final note, the court does not address Occidental's third count, "Suit on Open Account," because that count is dependent on resolution of the breach of contract claims in counts four and five.